**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 24-cv-2245-GPG-MDB

JOEL L. VIGIL,

      Plaintiff,

v.

STAFFING NETWORK HOLDINGS LLC d/b/a QUALITY PLACEMENT AUTHORITY,
HELENE CHRISTNER,
MICHAEL ALLEN,
TRISHA KAUTZ,
KAREN RAY,
CLAUDIA FLINT,
APRIL VALLEJOS,
SHELINA HAIRE,
MITCHELL MULL,
O'RYAN TAYLOR, individually,

      Defendants.

---

**[PROPOSED] JOINT SCHEDULING ORDER**

---

**1. DATE OF CONFERENCE
AND APPEARANCES OF COUNSEL AND PRO SE PARTIES**

    A Scheduling Conference pursuant to Fed. R. Civ. P. 16(b) has not been

scheduled for in this matter. Counsel for the parties is as follows:

| | |
|---|---|
| David G. Maxted | John C. Matthews |
| Stephanie M. Frisinger | Brady J. Ambron |
| MAXTED LAW, LLC | White and Steele, P.C. |
| 1543 Champa Street, Suite 400 | Dominion Towers, North Tower |
| Denver, CO 80202 | 600 17th Street, Suite 600N |
| dave@maxtedlaw.com | Denver, CO 80202 |
| stephanie@maxtedlaw.com | jmatthews@wsteele.com |
| | bambron@wsteele.com |

*Counsel for Plaintiff*

*Counsel for Defendants Staffing Network
Holdings & Karen Ray*

Gregory R. Bueno
Mark C. Lockefeer
Office of the Colorado Attorney General
Ralph L. Carr Judicial Building
1300 Broadway, 10th Floor
Denver CO 80203
gregory.bueno@coag.gov
mark.lockefeer@coag.gov

*Counsel for CDOC Defendants*

## 2. STATEMENT OF JURISDICTION

Plaintiff contends this action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and 42 U.S.C. § 1983 and 42 U.S.C. § 1988, as well as Colorado state law.

Plaintiff contends jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202. Jurisdiction supporting Plaintiff's claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988, and other relevant law.

Supplemental jurisdiction over state claims is conferred by 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and meritorious and the state causes of action arise from a common nucleus of operative facts.

Plaintiff contends venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged in the Complaint occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this litigation.

Counsel for Staffing Network Holdings and Ray (collectively "SNH Defendants")
do not contest this court's jurisdiction over this matter. The CDOC Defendants likewise
do not dispute that this Court's jurisdiction is proper.

### 3. STATEMENT OF CLAIMS AND DEFENSES

**<u>Plaintiff</u>**: Plaintiff Joel L. Vigil is a beloved son, brother, and uncle, and was a
father before his son recently and tragically passed away. Mr. Vigil was just 41 years old
when he became permanently disabled as a result of failed and delayed medical care in
SCF. Mr. Vigil entered CDOC custody in May 2022 to serve the remainder of a five-year
prison sentence and his mandatory release date is currently August 12, 2025. Before
suffering the damages alleged in the Complaint, Mr. Vigil planned to return to his work
in commercial and residential remodeling after his release from prison.

Now, Mr. Vigil suffers from debilitating chronic pain and is permanently disabled
due to the Defendants' failure to ensure he received necessary medical care while in
custody of the Colorado Department of Corrections (CDOC). When Defendants failed to
treat Mr. Vigil for an apparent spinal infection which caused severe back pain and other
neurological symptoms, he suffered a spinal epidural abscess, an infection that caused
swelling to damage his spinal cord, with predictable and lasting damage due to
Defendants' failures. For nearly a week in August of 2022, Defendants watched Mr. Vigil
suffer worsening back pain and extremely alarming neurological symptoms, including
impaired feeling and impaired use of his legs, as well as abnormal vital signs and other
indicators of a spinal infection. Mr. Vigil's symptoms set off obvious alarm bells for a
medical emergency related to his spine, including a spinal epidural abscess.

3

Despite Mr. Vigil's repeated declarations of a medical emergency and desperate cries for help, and despite knowing his condition obviously necessitated emergency care, Defendants repeatedly failed to take necessary action to hospitalize or otherwise ensure Mr. Vigil received urgent care. Because of Defendants failures, a deadly but treatable spinal epidural abscess festered unimpeded, causing permanent damage to Mr. Vigil.

When Defendants belatedly hospitalized Mr. Vigil, hospital staff immediately recognized the critical emergency and called for a flight-for-life to transport Mr. Vigil to Denver Health from Sterling for life-saving surgery for the untreated spinal epidural abscess. Mr. Vigil suffered reasonably foreseeable harms including severe pain and suffering, permanent neurological damage, being forced to use a colostomy bag for nearly a year and a half, and other damages, due to Defendants' actions and failure to act.

Despite multiple surgeries and the passage of almost two years since this medical crisis, Mr. Vigil suffers substantial, daily chronic pain, ongoing neuropathy including numbness and intense pins and needles, and neurological impairment in his legs. He requires a wheelchair to mobilize, and suffers impaired ability to walk only limited distances with assistance.

*May – Early August 2022*

During medical intake entering prison at Denver Reception and Diagnostic Center on May 23, 2022, medical staff did not note any health concerns related to Mr.

Vigil's mobility or any neurological symptoms. Medical staff evaluated his mobility, finding that Mr. Vigil had a

normal gait, no difficulty sitting down or standing up, and no difficulty with other movements. They found he moved all extremities equally, had no deformities or muscle atrophy, and evaluated both his upper and lower extremity muscle strength at a 5/5.

Mr. Vigil arrived at SCF in early August 2022, and during his intake on August 9 and 10, SCF medical staff did not note any health concerns.

*August 14 – Defendants On Notice Of Alarming Spinal Symptoms*

By August 14, less than a week after arriving at SCF, Mr. Vigil began exhibiting alarming neurological symptoms relating to his spine. Mr. Vigil knew something was wrong and told that to Defendants. He felt severe back pain and a complete lack of energy. He declared a medical emergency and reported his concerning symptoms, including constant low back pain and spasms.

Mr. Vigil went to prison medical and was seen by Defendant Flint, who learned of his alarming symptoms including back pain and spasms, which caused him to walk slowly and abnormally in a hunched position. She saw his obvious pain and discomfort and knew Mr. Vigil had been healthy at intake, and that these neurological symptoms were new and abnormal. Defendant Flint reported the symptoms to Defendant Allen, but he failed to evaluate Mr. Vigil in person, and Defendant Allen did nothing further than order over the counter pain medications, Tylenol and Ibuprofen, and a muscle relaxant. As would any medical personnel armed with this knowledge, even at this initial

assessment on August 14 Defendants Flint and Allen knew Mr. Vigil's symptoms indicated possible spinal infection or other serious spinal or neurological condition.

Defendants Flint and Allen, as well as all medical staff Defendants alleged in the Complaint, knew Mr. Vigil is part of a population, *i.e.,* incarcerated persons with increased histories of substance use, at heightened risk for spinal epidural abscess due to risk factors. Defendants knew such spinal infection or condition could pose serious dangers to his health and life. Foreshadowing the deliberate indifference to come, Defendants Flint and Allen failed to take any urgent action, including failing to recommend Mr. Vigil be seen by a neurologist or hospitalized for evaluation.

On an ongoing basis at each point in the failure to provide care, medical staff Defendants had access to and reviewed Mr. Vigil's medical record documenting his worsening condition from August 14 onward.

### *August 15 – Defendants Ray and Kautz Deliberately Indifferent To Mr. Vigil's Excruciating Back Pain And Inability To Walk or Stand*

Mr. Vigil's condition and pain worsened, and the following day, on August 15, 2022, he felt excruciating pain to the point where he could not get up and walk. He again declared a medical emergency, his second in two days. Mr. Vigil could not walk or stand, so correctional officers had to physically pick him up and place him into a wheelchair to transport him to medical. This medical emergency, and the fact Mr. Vigil could not walk and needed a wheelchair and his other alarming symptoms, was documented in both the medical records accessed by medical staff and the prison records accessed by officers on an ongoing basis.

Once corrections staff wheeled Mr. Vigil into the medical unit, QPA Defendant
Ray assessed Mr. Vigil who was self-evidently suffering excruciating back pain, so
severe he could not walk or stand. She observed his obvious pain and discomfort. Mr.
Vigil described the pain radiating in his lower back or kidney area. He had no history of
kidney stones and was urinating without difficulty or pain, ruling out a kidney stone as a
source of the pain.

QPA Defendant Ray took vital signs and learned Mr. Vigil's vital signs were
abnormal – his heart rate was very high at 121 beats per minute – which sent alarm
bells off that Mr. Vigil was experiencing an infection. Defendant Ray also learned, and
reported to Defendant Kautz, the provider on staff on August 15, and included in the
medical records, that Mr. Vigil had not suffered any kind of physical injury to his back,
ruling that out as a possible source of the back pain. This further confirmed the likely
infection harming him and causing the reported, and obvious, symptoms.

QPA Defendant Ray knew, as even laypersons do, that abnormal vital signs
were indicative of an infection. Defendant Ray knew that combined with Mr. Vigil's
worsening back pain and inability to stand or walk, this potential infection impacting his
spine may be a spinal epidural abscess or other serious infection or spinal condition
placing him at risk of paralysis or other serious harm. QPA Defendant Ray spoke by
phone with Defendant Kautz and reported Mr. Vigil's worsening symptoms as alleged in
the Complaint. Defendant Kautz ordered an X-ray, a urinalysis, and blood work,
confirming Defendants were fully aware that Mr. Vigil likely was suffering from an
infection which, combined with the severe back pain and other symptoms, may be a

spinal epidural abscess or other severe spinal infection or spinal condition. Confirming
she subjectively knew a spinal infection of this nature would lead to severe harms,
Defendant Kautz ordered the urinalysis on an emergency basis as a STAT lab, meaning
the results would be available after 4 hours. Defendant Kautz also ordered an X-ray and
blood tests, further indicating she understood the immediacy of the crisis.

However, when the STAT lab showed clear signs of infection, Defendants Kautz,
Ray, and the other medical Defendants as alleged in the Complaint, failed to take
obvious action in deliberate indifference to Mr. Vigil's health and life. The urinalysis
showed Mr. Vigil tested positive for leukocytes, a type of white blood cell which fights
infection, making the positive test, in conjunction with his symptoms, a clear indicator of
a spinal infection, including a spinal epidural abscess. And the X-ray ruled out a kidney
stone and indicated spinal degeneration, making it even more likely and obvious to
Defendants that Mr. Vigil was suffering from a spinal infection, including a spinal
epidural abscess. Degeneration in the spine is a well-known risk factor for a spinal
epidural abscess, which as medical professionals all medical Defendants alleged in the
Complaint would have and did understand.

Further evincing her deliberate indifference, despite knowing the emergent
situation unfolding Defendant Kautz failed to personally speak with or evaluate Mr. Vigil
on August 15, 2022. And despite knowing pain medication and a muscle relaxer were
insufficient, Defendant Kautz again ordered pain medication and a muscular injection.
Defendants Kautz and Ray both knew such measures would fail to treat the underlying
infection impacting the spine, and would be obviously insufficient to prevent the

neurological and other harms that a spinal infection would inflict. Moreover, Defendants knew Mr. Vigil had reported being in such severe pain and inability to mobilize that he was unable to obtain medication on at least one occasion from the med-line because he was physically unable to get there. Despite this glaring red flag that urgent care and further evaluation was needed, Defendants failed to take action.

QPA Defendant Ray knew that what Defendant Kautz ordered was insufficient to treat the medical emergency. She knew that Mr. Vigil needed emergency care at the hospital based on her in person assessment of his severe and obvious neurological symptoms, but failed to call an ambulance or transport Mr. Vigil to the hospital, consistent with Defendant QPA's failed training, policies, practices, and procedures.

Defendant Kautz also failed and showed deliberate indifference by failing to complete her encounter with Mr. Vigil, or ensure a transition to another medical staff. Instead, Defendant Kautz left work that day having failed to complete her duties to Mr. Vigil as alleged in the Complaint, then went out on leave due to COVID-19 exposure for the following week. For her own part, Defendant Ray knew that this failure to transition care endangered Mr. Vigil, yet failed to take action to ensure emergency care was provided to Mr. Vigil.

Defendants Kautz and Ray knew as of August 15 that Mr. Vigil's ongoing severe back pain, combined with other indicators of infection, signaled that a spinal epidural abscess was a very serious risk presenting catastrophic consequences of not treated, including death or paralysis. Despite this knowledge, they failed to ensure he received emergency care including a full evaluation, MRI scans, and immediate work-up for

potential infection, with treatment to follow, all of which could have and should have occurred by August 15. This failure to act was in deliberate indifference to the known and obvious dangers facing Mr. Vigil by this juncture.

Defendants all knew, as any medical provider and laypersons are aware, the serious risks of delayed treatment of severe spinal and neurological symptoms, including risks of permanent neurological damage, paralysis, and death.

At a minimum, by August 15 and every day thereafter, each Defendant alleged in the Complaint knew that Mr. Vigil's worsening and obvious neurological symptoms and pain indicated a medical emergency requiring emergency hospitalization. Mr. Vigil's condition was so clearly emergent by August 15, and every day thereafter, even a layperson would have known to call for an ambulance or transport him to the hospital. Defendants failed to hospitalize Mr. Vigil in deliberate indifference to substantial dangers to his life and health.

*Defendant QPA's Deliberately Indifferent Policies, Procedures, and Training*

QPA's policies, procedures, practices, customs, supervision, and training (collectively "policy" or "policies") were a moving force in the constitutional violations by QPA Defendant Ray, including without limitation the following:

- First, QPA implemented a policy of failing to provide and delaying emergency medical care for incarcerated patients like Mr. Vigil who are in obvious need of emergency medical care.

- Second, QPA implemented a policy of failing to require or train its nurses including Defendant Ray to call an ambulance or arrange other emergency care or hospitalization for patients like Mr. Vigil who are in obvious need of emergency medical care.

- Third, QPA implemented a policy of failing to require or train its nurses including

Defendant Ray to act upon or follow up on labs ordered STAT for patients like
Mr. Vigil who required timely review of labs that would have assisted in
diagnosing him and provided further evidence he needed immediate emergency
care for a life-threatening infection.

- Fourth, QPA implemented a policy of failing to require or train its nurses to follow
  through on or ensure transition of care for a patient including Mr. Vigil,
  particularly one facing a life-threatening emergency.

- Fifth, QPA implemented a policy of failure to train or supervise staff which was a
  moving force in Mr. Vigil's suffering and permanent disability. QPA Defendant
  Ray acted consistent with QPA policies, including their training and supervision,
  and on information and belief, Defendant Ray was not disciplined or found to
  have acted outside of company policy related to Mr. Vigil's failed and delayed
  medical care.

As alleged in the Complaint, QPA implemented other policies which were also a

moving force in causing the state and federal rights violations alleged.

*August 16 – In Deliberate Indifference, Defendant Haire Fails To Act Despite Mr. Vigil's
Worsened Condition And Inability to Stand*

On August 16, 2022, Mr. Vigil declared his third medical emergency in three

days, once again begging for the help Defendants repeatedly denied him. Mr. Vigil's

severe spinal pain and symptoms had only continued and worsened, and he reported

the pain was progressively getting worse in his back. When corrections staff informed

nurse Defendant Haire of the medical emergency, Defendant Haire callously brushed it

off, stating she "would call [Mr. Vigil] over when they [medical] had time." Defendant

Haire failed to take any action to assess the emergency at that time, causing delay in

Mr. Vigil even being seen by medical at that time, in deliberate indifference to the

substantial risks to his health and life. Confirming her total and deliberate indifference,

Defendant Haire never did call Mr. Vigil to medical on August 16 despite the ongoing

medical emergency. Instead, later that day, during the 11:15 a.m. count, corrections

11

officers found Mr. Vigil on the floor of his cell unable to move or get up off the floor. Corrections officers again called medical. Because Mr. Vigil could not move or get up off the floor, officers had to physically lift Mr. Vigil off the floor and into a wheelchair to transport him to medical.

Once he was wheeled into medical, Defendant Haire assessed Mr. Vigil, who was in visible and obvious pain, and learned that Mr. Vigil was experiencing worsening and debilitating lower back pain. She learned his pain was so severe that he could not even walk to chow to eat, and that he had not eaten in four days as a result. Defendant Haire knew this was Mr. Vigil's third medical emergency in three days and knew that his worsening symptoms meant he needed immediate emergency care. As alleged in the Complaint, the spinal and neurological symptoms like inability to walk or use his legs were known to her and medical staff, as well as laypersons, to indicate potential spinal infection or other spinal or neurological condition necessitating obvious urgent care. Defendant Haire further knew that the pain medication and muscle relaxant previously prescribed had obviously not worked, and that Mr. Vigil's pain and condition had only worsened, further indicating the need for additional evaluation and care a hospital could provide. Mr. Vigil's vital signs also indicated infection, including elevated heart rate.

Despite these known and obvious serious risks to Mr. Vigil's life and health, including from spinal epidural abscess, Defendant Haire failed to hospitalize Mr. Vigil, failed to contact a provider, failed to request transport to the emergency room, and failed to take any other action to treat his worsening and catastrophic spinal condition, in deliberate indifference to the consequences.

*August 18 – In Deliberate Indifference, Defendants Vallejos And Allen*
*Fail To Hospitalize Mr. Vigil*

Mr. Vigil's deterioration continued unimpeded with Defendants callous disregard

for the ongoing medical emergency. On August 18, 2022, Mr. Vigil declared his fourth

medical emergency since August 14, once again desperately seeking emergency

medical care. Because Mr. Vigil could not stand, correctional officers for the third time

had to physically lift Mr. Vigil up and into a wheelchair to transport him to medical.

Once Mr. Vigil arrived in medical in a wheelchair in obvious and excruciating

pain, Defendant Vallejos assessed Mr. Vigil and observed he could not walk for fear of

collapse. She took his vital signs and knew Mr. Vigil's vital signs were abnormal and

indicated infection– his heart rate was extremely high at 138 beats per minute. She also

knew he was visibly sweating, which set off alarm bells that he had a fever, another sign

of infection as Defendant Vallejos knew. Defendant Vallejos also knew this was Mr.

Vigil's fourth medical emergency in five days and knew that his obvious, severe, and

worsening spinal pain and neurological symptoms meant he needed immediate

emergency care for potential spinal epidural abscess or other spinal infection. She knew

based on his worsening, obvious neurological symptoms that Mr. Vigil's situation was

catastrophic and required emergency care due to the risks of paralysis, death, or other

serious harm.

Defendant Vallejos called the on-call provider, Defendant Allen and reported Mr.

Vigil's symptoms as alleged in the Complaint, which Defendant Allen also knew about

from the medical records and his prior failed treatment of Mr. Vigil. Defendant Allen

knew Mr. Vigil's worsening symptoms indicated spinal epidural abscess, a life-

threatening infection. Despite the ongoing medical emergency and repeated cries for help from Mr. Vigil, Defendant Allen showed callous disregard and failed to even personally evaluate or assess Mr. Vigil.

Defendants Vallejos and Allen failed to ensure an emergency provider would physically assess Mr. Vigil or treat his apparent spinal infection and related symptoms, failing to call for an ambulance or hospitalize him or take any action to ensure he received emergency care, in deliberate indifference to the substantial risks.  Defendants Allen and Vallejos also knew that pain medication and other medications previously prescribed had not alleviated the symptoms, which had only gotten much worse, and that other possible causes or diagnoses had been ruled out. Despite this, they failed to take the emergency action the circumstances obviously required.

For her own part, Defendant Vallejos knew Defendant Allen's actions were wholly inadequate to the emergency facing Mr. Vigil. Defendant Allen had plainly failed to take necessary action and merely ordered medication which everyone knew had failed to alleviate the symptoms and would fail to treat a spinal infection causing the symptoms. Defendant Vallejos had a duty to take action to ensure Mr. Vigil did receive the care he needed, including calling 911 for an ambulance or going up the prison chain of command to ensure Mr. Vigil's obvious emergency was addressed, yet she failed to do so in deliberate indifference to the consequences.

*April 19 – In Deliberate Indifference, Defendants Flint and Christner Delay For Hours Despite Knowing Mr. Vigil May Be Paralyzed*

Mr. Vigil's untreated spinal infection continued to cause predictable damage as it remained untreated, and on August 19, 2022, he became unable to move his legs,

14

experiencing total paralysis in his legs. Around 4:30 p.m., other incarcerated people in Mr. Vigil's declared a medical emergency on his behalf to Defendant Mull, a correctional officer in Mr. Vigil's unit. Defendant Mull and his unit supervisor, Defendant Taylor, found Mr. Vigil in his cell, unable to walk or stand, paralyzed from the waist down, and once again in excruciating pain.

Defendants Mull and Taylor knew Mr. Vigil had been experiencing a medical emergency for several days now from working in the facility and from Mr. Vigil's prison records documenting his deteriorating condition and multiple medical emergencies, which both corrections and medical staff document in records and are aware of on the unit. Defendant Mull called medical to report Mr. Vigil's emergency and worsening symptoms, but Defendant Flint responded that medical would not see Mr. Vigil until after med-line had finished, in callous disregard to the emergency or obvious risks to Mr. Vigil. As alleged in the Complaint, this inaction and disregard by Defendant Flint was deliberately indifferent and inexcusable. But Defendants Mull and Taylor themselves knew Mr. Vigil needed immediate emergency care and that med-line would take hours to conclude, a delay which they knew put Mr. Vigil's health and life in serious danger.

Defendants Mull and Taylor also knew that medical staff at SCF had on prior occasions failed to provide necessary care for incarcerated persons resulting in prior instances of unnecessary death and catastrophic injury. Defendants Mull and Taylor knew that Defendant Flint putting off necessary medical care until after med-line was absolutely unacceptable and, given Mr. Vigil's obvious emergency, placed him at risk of serious harm. They knew that Mr. Vigil had no way to get the emergency assistance he

needed on his own – as an incarcerated person, he could not call 911 or otherwise transport himself to the hospital. They knew they had a duty to act to hospitalize Mr. Vigil, call 911 for emergency care, report the emergency to higher in the command chain, or take any other urgent action to ensure Mr. Vigil received emergency care. Despite the knowledge and ability to take such action, Defendants Mull and Taylor acted with deliberate indifference and failed to perform their duties, including their gatekeeper role, to get Mr. Vigil immediate emergency medical care in this urgent and obvious crisis.

By refusing to even see Mr. Vigil until after med-line finished, Defendant Flint was deliberately indifferent to Mr. Vigil's serious and emergent medical needs, particularly given she knew of Mr. Vigil's condition from emergencies declared throughout the week (including an emergency Defendant Flint herself failed to address August 14). Mr. Vigil lay in his cell for over three hours after the other incarcerated people in his unit declared the medical emergency on his behalf. At about 7:42 p.m. on August 19, Mr. Vigil again declared a second medical emergency of the day, pleading for the emergency medical care he knew he needed. Correctional officers called medical staff who failed to call for an emergency transport or to go see Mr. Vigil at his cell. Mr. Vigil could not move his legs—he could not stand or walk to medical. Correctional officers physically lifted Mr. Vigil into a wheelchair, then carried him down two flights of stairs, and then transferred him to a gurney to be carried to medical.

Defendant Flint finally saw Mr. Vigil around 8:00 p.m. Mr. Vigil's inability to move his legs and other neurological symptoms once again made obvious his spinal infection,

in addition to the severe back pain and other alarming symptoms he continually had reported. Defendant Flint called Defendant Christner, the on-call provider that evening, who despite Mr. Vigil's terrible condition, failed to urgently order him to the emergency room. Despite knowing he needed immediate emergency care for obvious spinal damage including spinal epidural abscess (and despite knowing from the medical record that labs already had indicated an infection for several days), she failed to call for an ambulance or emergency transport to the hospital, and inexplicably delayed care by ordering lab testing.

At 10:45 p.m., over 6 hours after other incarcerated people had declared Mr. Vigil's first medical emergency of that day, Defendant Christner finally order that Mr. Vigil be sent to Sterling Regional Medical Center for further evaluation. Mr. Vigil left SCF by ambulance to Sterling Regional shortly after. This inexcusable 6-hour delay by Defendants Flint, Christner, Mull, and Taylor, was obvious deliberate indifference to Mr. Vigil's health and well-being.

Immediately upon being hospitalized that evening, doctors there knew Mr. Vigil needed what had been obvious for days – urgent care for spinal injury. Within minutes, they called neurosurgery at Denver Health and ascertained his "complete paralysis from the waist down" was "obviously highly concerning for spinal cord compromise" likely due to "epidural abscess" caused by an infection. Hospital staff ordered a flight-for-life helicopter transport of Mr. Vigil from Sterling Regional to Denver Health within an hour of his arrival to Sterling Regional.

There were so many opportunities for Mr. Vigil to have received the care he

obviously needed. On August 14, 15, 16, 18, or earlier on August 19, had Defendants taken appropriate action and not failed to act as alleged in the Complaint, and had Mr. Vigil received timely medical care, this spinal abscess would have been identified by MRI and treated, preventing the severe and lasting harms alleged in the Complaint.

*August 20 – Mr. Vigil Arrives At Denver Health On The Brink Of Death Due To Defendants Deliberate Indifference*

Mr. Vigil arrived at Denver Health by flight-for-life helicopter in the early hours of August 20, 2022. Denver Health staff observed Mr. Vigil was "critically ill" and the "[s]everity of [his] problems are such that death would be possible or probable without provision of critical care." Denver Health immediately ordered an MRI of Mr. Vigil's spine given the obvious back pain and spinal symptoms Mr. Vigil had been suffering— an action which would have been taken days earlier had Defendants performed their duties. The MRI showed what had been obvious for days: a spinal epidural abscess, an infection causing swelling and pressure on the spinal cord, damaging the neurological organ.

*Additional Severe Pain, Suffering, And Multiple Surgeries*

Mr. Vigil suffered severe pain, emotional distress, and physical injuries, which were the reasonably foreseeable consequences of Defendants' failures alleged in the Complaint. As Defendants and laypersons know, delaying care, and delaying critical life-saving surgery particularly as to a spinal injury, increases the risks of complications and other adverse outcomes. Mr. Vigil's suffering continued even after he reached Denver Health and underwent emergency surgery.

Mr. Vigil suffered an additional infection necessitating follow-up surgeries. On

August 24, 2022, Denver Health hospital staff again performed surgery to address this related infection. Upon cutting into his abdomen, surgeons observed "foul smelling gas released from the abdomen," and found that feces had leaked into the abdomen due to ischemia, or impaired blood flow, that resulted in multiple perforations to the colon. These reasonably foreseeable results of the surgery forced the surgeon to remove about 75 percent of Mr. Vigil's colon.

The surgeons also created a stoma on Mr. Vigil's abdomen for fecal waste to pass through and into an ostomy bag.

Because of the loss of a large portion of his bowel, Mr. Vigil's digestive tract will never absorb liquid and digested nutrients in the same way. He will suffer from nutrient deficiencies due to lack of nutrient absorption by his bowel for the rest of his life. He will also suffer from diarrhea for life due to the lack of absorption of water and other liquids by his bowel.

Mr. Vigil remained in Denver Health for almost a month – 28 days – indicating his pain and the severity of his condition. He was discharged to Kindred Aurora, a rehabilitation hospital, where he remained for over a month – again indicating his pain and the severity of his condition. Mr. Vigil experienced severe pain and suffering throughout his hospitalizations and thereafter.

Mr. Vigil also continued to suffer from a bladder impairment in which the nerve that controls his bladder function was damaged as a result of Defendants' deliberate indifference, so he no longer had voluntary control of his urination. Mr. Vigil required a foley catheter to urinate.

Mr. Vigil was forced to use a colostomy bag to defecate for almost 18 months, and a catheter to urinate for about 4 months, due to the delays and failures of Defendants, causing substantial additional pain, suffering, humiliation, and other damages.

Medical staff have informed Mr. Vigil that he has "true spinal cord injuries that will not improve with time. Spinal cord injuries are permanent and will remain this way." CDOC noted that the neurosurgeon does not expect "any major improvements to happen in the way of motor function."

Today, Mr. Vigil continues to experience daily severe pain, often a 10/10, and uses a wheelchair to mobilize due to the ongoing and permanent pain, neuropathy in his legs including severe pins and needles and impaired sensation, and other damages caused by the delays and failures of Defendants as alleged in the Complaint.

**Defendants Staffing Network Holdings & Karen Ray:**

Defendants Staffing Network Holdings and Karen Ray deny any wrongdoing as alleged by Plaintiff and state that they met all applicable standards of care with respect to any treatment provided to Plaintiff. At no time did Ms. Ray or Staffing Network Holdings recklessly or knowingly deny medical treatment for a serious medical condition, or act with deliberate indifference as alleged by Plaintiff. Similarly, Staffing Network Holdings denies that they maintained deliberately indifferent policies, customs, procedures, decision-making, supervision, and training, and further deny that they violated Plaintiff's Eighth Amendment rights or posed an excessive risk to persons such as Plaintiff. Staffing

Network Holdings further denies that it could be vicariously or otherwise liable for any of the claims raised by Plaintiff.

Defendants Staffing Network Holdings and Karen Ray reserve the right to assert all applicable defenses, including that of qualified immunity, failure to state a claim, Staffing Network Holdings is not subject to the doctrine of respondeat superior for the conduct alleged in the Complaint, and any other defenses asserted on the Answer or learned about through discovery.

Defendants Staffing Network Holdings and Karen Ray incorporate, by reference, the assertions and defenses raised in their answer. Without waiving these assertions and defenses, Staffing Network Holdings and Karen Ray contest both liability and damages at this time.

**CDOC Defendants:**

The CDOC Defendants deny Plaintiff's substantive claims and allegations and maintain that any medical care they provided to him did not violate the Eighth Amendment or any other federal or state law. To the extent Plaintiff's Complaint raises any "gatekeeper" claims under the Eighth Amendment, the CDOC Defendants deny that they took any action that interfered with or obstructed Plaintiff's ability to obtain medical care while in CDOC custody. Additionally, the CDOC Defendants reserve the right to raise any and all separate an affirmative defenses they pleaded in their answer. *See* CDOC Defs. Answer, ECF No. 32.

## 4. UNDISPUTED FACTS

1.    Plaintiff was incarcerated at in the Colorado Department of Corrections (CDOC) during the events giving rise to his Complaint.

2.    Plaintiff was incarcerated at Sterling Correctional Facility during the events giving rise to his Complaint.

3.    Defendants Helene Christner, Michael Allen, Trisha Kautz, Claudia Flint, April Vallejos, Shelina Haire, Mitchell Mull, and O'Ryan Taylor were employed by the CDOC at all times relevant hereto.

4.    Defendant Staffing Network Holdings, L.L.C., dba Quality Placement Authority, is a Delaware company providing medical services within CDOC at Sterling Correctional Facility (SCF), and at all times relevant was the employer of Defendant Karen Ray. The principal address is located at 1815 S Meyers Rd Ste 600, Oakbrook Terrace, IL 60181, and its registered agent in Colorado is Cogency Global Inc. at 600 17th St Ste 1450S, Denver, CO 80202.

5.    Defendant Karen Ray was a citizen of the United States, resident of the state of Colorado and was engaged with Staffing Network Holdings L.L.C. dba Quality Placement Authority at all times relevant hereto.

## 5. COMPUTATION OF DAMAGES

**Plaintiff:**

Plaintiff seeks all appropriate relief at law and equity; declaratory relief and other appropriate equitable relief; economic losses on all claims as allowed by law; compensatory and consequential damages, including damages for emotional distress,

loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial; punitive damages on all claims allowed by law and in an amount to be determined at trial; attorneys' fees and the costs associated with this action, including expert witness fees, on all claims allowed by law; pre- and post-judgment interest at the appropriate lawful rate; and any further relief that this court deems just and proper, and any other relief as allowed by law.

In addition to compensatory, economic, consequential and special damages, Plaintiff is entitled to punitive damages against Defendants, in that their actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

Plaintiff's damages are not of the type that can be tallied here. Plaintiff has claims for emotional distress damages. These are not quantifiable other than by a jury. Undersigned counsel will provide Defendants in this matter with whatever quantifiable evidence is obtained to show measurement of damages, but civil rights violations like this are not given to easy description of losses and instead require that the jury announce their value.

A more precise computation of Plaintiff's damages, to the extent the damages are subject to such computation, will be provided during the normal course of discovery, and will be determined by a jury in its sound discretion following a presentation of the evidence at trial in this matter.

**<u>Defendants Staffing Network Holdings & Karen Ray</u>:**

Defendants Staffing Network Holdings and Karen Ray do not claim compensatory damages, but may seek contractual and equitable indemnity, and reserve the right to seek fees and costs as allowed by applicable law.

**<u>CDOC Defendants</u>:**

The CDOC Defendants do not anticipate seeking any damages but respectfully reserve the right to seek indemnity and to recover reasonable fees and costs.

## 6. REPORT OF PRECONFERENCE DISCOVERY AND MEETING UNDER FED. R. CIV. P. 26(f)

a.  The Fed. R. Civ. P. 26(f) meeting was conducted via video conference between counsel on **November 18, 2024**.

b.  Participants in the meeting were as follows: Stephanie Frisinger and David Maxted for Plaintiff, Brady Ambron for Defendants Staffing Network Holdings and Karen Ray, and Gregory Bueno and Mark Lockefeer for the CDOC Defendants.

c.  The parties will make their Rule 26(a)(1) disclosures on or before **December 9, 2024**.

d.  The parties propose a one week extension of time to the timing of required disclosures under Fed. R. Civ. P. 26(a)(1) due to the Thanksgiving Holiday.

e.  The parties have not agreed to conduct informal discovery.

f.  The parties agree to take all reasonable steps to reduce costs to discovery, including using a unified exhibit numbering system.

g.  The parties anticipate that their claims or defenses will involve the discovery of some electronically stored information. To the extent that discovery or disclosures

involves information or records in electronic form, the Parties will take steps to preserve that information.  The Parties agree that, to the extent feasible, the Parties will exchange information (whether in paper or electronic form) in PDF format, in accordance with the Court's Protective Order, and the protections afforded to confidential materials exchanged in discovery.

h.  The parties have discussed the possibilities for a prompt settlement or resolution of the case by alternate dispute resolution, but at this juncture settlement appears premature. The parties will continue to work together in good faith to determine whether the matter can be resolved.  To the extent there is a settlement meeting, the parties will report the result of any such meeting, and any similar future meeting, to the magistrate judge within 14 days of the meeting.

## 7. CONSENT

The parties have not consented to the exercise of jurisdiction of a magistrate judge.

## 8. DISCOVERY LIMITATIONS

a.  Modifications which any party proposes to the presumptive numbers of depositions or interrogatories contained in the Federal Rules:

In addition to the named Parties, experts, and 30(b)(6) depositions, each side (with Plaintiff, the Staffing Network Holdings Defendants, and the CDOC Defendants each constituting a side) will be limited to five fact depositions per party group.

The Parties propose the following modification to the limitations on interrogatories: a party may serve on any other party no more than 18 written interrogatories.

b.  Limitations which any party proposes on the length of depositions: The Parties do

not propose any modifications to the limitations on the length of depositions. A deposition is limited to one day of seven hours as provided in Fed.R.Civ.P. 30(d)(2).

c.  Limitations which any party proposes on the number of requests for production and/or requests for admission: Plaintiff may serve 30 Requests for Production and 25 Requests for Admission to each defendant group (Staffing Network Holdings Defendants and CDOC Defendants).  Each defendant group (Staffing Network Holdings Defendants and CDOC Defendants) may serve a total of 30 Requests for Production and 25 Requests for Admission to be answered by Plaintiff.

d.  Deadline for service of Interrogatories Requests for Production of Documents and/or Admissions: Plaintiff proposes submission of the written interrogatories at any time after the date of entry of the Scheduling Order.  The last written discovery requests shall not be served upon any adverse party any later than forty-five (45) days prior to discovery cut off.

e.      Other Planning or Discovery Orders: Since Plaintiff is incarcerated, the parties will seek leave of the Court to depose him in accordance with Fed. R. Civ. P. 30(a)(2)(B) if Plaintiff is still incarcerated at the time of his deposition. However, the parties agree at this time that any deposition of Plaintiff will take place once he is released from prison in the summer of 2025. Plaintiff's current Mandatory Release Date is July 12, 2025.

The parties agree that Mr. Vigil's deposition will take place during the timeframe of July 7, 2025 – July 18, 2025.  In the event that Mr. Vigil's incarceration extends beyond that timeframe for any reason, the parties agree that his deposition will take place at the

prison facility.

### 9. CASE PLAN AND SCHEDULE

a.  Deadline for Joinder of Parties and Amendment of Pleadings: **February 14, 2025.**

b.  Discovery Cut-off: **October 31, 2025**

c.  Dispositive Motion Deadline**: January 16, 2026.**

d.  Expert Witness Disclosure**:**

1.      (a) Plaintiff anticipates he may retain experts in the following areas: economics expert (regarding Plaintiff's damages); medical; corrections; and any expert necessary for rebuttal and/or impeachment purposes. Plaintiff may call experts in other areas as well.

(b) Staffing Network Holdings Defendants and/or Karen Ray anticipate calling experts in the following fields: an economic/life care planning expert; a medical expert to address standard of care; a medical expert to address Plaintiff's claimed injuries and damages; a medical expert in the field of correctional nursing; and any other experts necessary for rebuttal purposes. Staffing Network Holdings and/or Ms. Ray reserve the right to retain any additional experts deemed necessary during the discovery process.

(c) CDOC Defendants anticipate calling experts in the following fields: an economic/life care planning expert; a medical expert to address standard of care; a medical expert to address Plaintiff's claimed injuries and damages; a medical expert in the fields of correctional nursing; and any other experts necessary for rebuttal purposes.

2.      The Parties agree to limit the number of retained affirmative experts to four (4) per side (with Plaintiff, Staffing Network Holdings Defendants, and CDOC Defendants

each constituting a side).

3.    The parties shall designate all affirmative experts and provide opposing counsel and any pro se parties with all information specified in Fed. R. Civ. P. 26(a)(2) on or before **September 15, 2025.**

4.    The parties shall designate all rebuttal experts and provide opposing counsel and any pro se parties with all information specified in Fed. R. Civ. P. 26(a)(2) on or before **October 15, 2025.**

e.  Identification of Persons to Be Deposed:

| Name of Deponent | Date of Deposition | Time of Deposition | Expected Length of Deposition |
|---|---|---|---|
| Joel Vigil | TBD | TBD | 7 hours or less |
| Helene Christner | TBD | TBD | 7 hours or less |
| Michael Allen | TBD | TBD | 7 hours or less |
| Trisha Kautz | TBD | TBD | 7 hours or less |
| Karen Ray | TBD | TBD | 7 hours or less |
| Claudia Flint | TBD | TBD | 7 hours or less |
| April Vallejos | TBD | TBD | 7 hours or less |
| Shelina Haire | TBD | TBD | 7 hours or less |
| Mitchell Mull | TBD | TBD | 7 hours or less |
| O'Ryan Taylor | TBD | TBD | 7 hours or less |
| CDOC Rule 30(b)(6) witnesses | TBD | TBD | 7 hours or less per witness |
| Staffing Network Holdings Rule 30(b)(6) witnesses | TBD | TBD | 7 hours or less per witness |
| Other individuals disclosed pursuant to Fed.R.Civ.P. 26 or otherwise noticed by the parties | TBD | TBD | 7 hours or less per witness |
| Other witnesses to be identified during the course of discovery | TBD | TBD | 7 hours or less per witness |

**10. DATES FOR FURTHER CONFERENCES**

Final Pretrial Conference will be set after the dispositive motions deadline has passed and the Court has issued rulings on all such motions, or no dispositive motions have been filed (and the deadline is passed).  In either instance, within 15 days, the parties are to contact chambers via email Gallagher_Chambers@cod.uscourts.gov   to obtain a date for Final Pretrial Conference, at which GPG will set dates for trial preparation and trial.

a.  Status conferences will be held in this case at the following dates and times: _____.

b.  A final pretrial conference will be held in this case on _____ at o'clock _____ m. A Final Pretrial Order shall be prepared by the parties and submitted to the court no later than seven (7) days before the final pretrial conference.

## 11. OTHER SCHEDULING MATTERS

a.    Identify those discovery or scheduling issues, if any, on which counsel after a good faith effort, were unable to reach an agreement: None.

b.    The parties anticipate that the jury trial will take seven (7) to ten (10) days.

c.    Identify pretrial proceedings, if any, that the parties believe may be more efficiently or economically conducted in the District Court's facilities at 212 N. Wahsatch Street, Colorado Springs, Colorado 80903-3476; Wayne Aspinall U.S. Courthouse/Federal Building, 402 Rood Avenue, Grand Junction, Colorado 81501-2520; or the U.S. Courthouse/Federal Building, 103 Sheppard Drive, Durango, Colorado 81303-3439: None.

## 12. NOTICE TO COUNSEL AND PRO SE PARTIES

The parties filing motions for extension of time or continuances must comply with D.C.COLO.LCivR 6.1(c) by serving the motion contemporaneously upon the moving

29

attorney's client.

Counsel will be expected to be familiar and to comply with the Pretrial and Trial Procedures or Practice Standards established by the judicial officer presiding over the trial of this case.

With respect to discovery disputes, parties must comply with D.C.COLO.LCivR 7.1(a) and the Magistrate Judge discovery dispute procedures.

Counsel and unrepresented parties are reminded that any change of contact information must be reported and filed with the Court pursuant to the applicable local rule.

## 13. AMENDMENTS TO SCHEDULING ORDER

The scheduling order may be altered or amended only upon a showing of good cause. However, any motion to extend deadlines must include sufficient information for the Court to conclude that the parties have been diligent in discovery.

DATED this 13th day of December, 2024.

BY THE COURT:

_____
Maritza Dominguez Braswell
United States Magistrate Judge

APPROVED:

_s/ Stephanie M. Frisinger_
David G. Maxted
Stephanie M. Frisinger
MAXTED LAW, LLC
1543 Champa Street, Suite 400
Denver, CO 80202
dave@maxtedlaw.com
stephanie@maxtedlaw.com

_Counsel for Plaintiff_

_s/ Brady J. Ambron_
John C. Matthews
Brady J. Ambron
White and Steele, P.C.
Dominion Towers, North Tower
600 17th Street, Suite 600N
Denver, CO 80202
jmatthews@wsteele.com
bambron@wsteele.com

_Counsel for Defendants Staffing Network
Holdings & Karen Ray_

<u>s/ *Gregory R. Bueno*</u>
Gregory R. Bueno
Mark C. Lockefeer
Office of the Colorado Attorney General
Ralph L. Carr Judicial Building
1300 Broadway, 10th Floor
Denver CO 80203
gregory.bueno@coag.gov
mark.lockefeer@coag.gov

*Counsel for CDOC Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on **December 9**, **2024,** I electronically filed the foregoing

**JOINT SCHEDULING ORDER** with the Clerk of Court using the CM/ECF system which

will send notification of such filing to the following:

John C. Matthews
Brady J. Ambron
White and Steele, P.C.
Dominion Towers, North Tower
600 17th Street, Suite 600N
Denver, CO 80202
jmatthews@wsteele.com
bambron@wsteele.com

*Counsel for Defendants Staffing Network
Holdings & Karen Ray*

Gregory R. Bueno
Mark C. Lockefeer
Office of the Colorado Attorney General
Ralph L. Carr Judicial Building
1300 Broadway, 10th Floor
Denver CO 80203
gregory.bueno@coag.gov
mark.lockefeer@coag.gov

*Counsel for CDOC Defendants*

*s/ Stephanie M. Frisinger*
Stephanie M. Frisinger